Albert Oldham v. The State.

No. 1308.   Decided November 8, 1911.

Rehearing denied January 10, 1912.

**1.—Murder—Evidence—Contradicting Witness.**

Where, upon trial of murder, a State's witness denied pointing to a certain tree and saying she was standing at it during the shooting, and a defendant's witness testified that she did point out this tree and said she was standing at it at the time of the shooting, there was no error in not admitting the further testimony that defendant's witness was familiar with the ground and that a person standing at said tree could not have seen the place where the shooting occurred; as this was an undisputed fact.

**2.—Same—Evidence—Bolstering up Witness.**

Where a little girl was permitted to testify for the defendant concerning a certain knife she found where the deceased was standing at the time he was shot, and there was no effort made by the State to contradict or impeach her testimony, there was no error in excluding a conversation between the little girl and a third party as to where she found the knife.

**3.—Same—Charge of Court—Insult to Female Relative—Adequate Cause—Manslaughter.**

Where, upon trial of murder, the defendant, in his testimony on direct examination said nothing about his wife having been insulted by the deceased, and that he acted upon this matter, but it had to be drawn out of him on cross-examination for the purpose of breaking down his defense of self-defense he was making, and this matter was submitted to the jury as to whether same was adequate cause and really produced passion, etc., rendering the defendant incapable of cool reflection, there was no reversible error in refusing defendant's special instructions that insult to a female relative was adequate cause per se.

**4.—Same—Bills of Exception—Evidence.**

Where there were no bills of exception to the admissibility of testimony, there was nothing to review on appeal.

**5.—Same—Charge of Court—Manslaughter—Burden of Proof.**

Where, upon trial of murder, the court's charge on manslaughter did not shift the burden of proof, when taken in connection with the entire charge, there was no error on this ground.

**6.—Same—Charge of Court—Self-Defense.**

Where, upon trial of murder, the requested charges together with the court's charge on self-defense, presented every theory of appellant's defense, there was no reversible error on this ground.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*J. W. Taylor and H. L. Taylor,* for appellant.—On the question of the court's charge on self-defense and refusal of requested charges: Brady v. State, 65 S. W. Rep., 521; Hickey v. State, 45 Texas Crim. Rep., 297, 76 S. W. Rep., 920; Richards v. State, 53 Texas Crim. Rep., 400, 110 S. W. Rep., 432; Lockhart v. State, 53 Texas Crim. Rep., 589, 111 S. W. Rep., 1025; Phipps v. State, 34 Texas Crim. Rep., 560; Stewart v. State, 40 Texas Crim. Rep., 649; Seley v. State, 43 Texas Crim. Rep., 66; Graham v. State, 61 S. W. Rep., 714; Drake v. State, 62 Texas Crim. Rep., 130, 136 S. W. Rep., 1065.

On the question of the court's failure to charge on manslaughter on the ground of insult to female relative: Wakefield v. State, 41 Texas, 148.

On the question of excluding testimony as to conversation between the girl witness and third party, regarding the finding of the knife: Jones v. State, 40 S. W. Rep., 807; Lockhart v. State, 53 Texas Crim. Rep., 589, 111 S. W. Rep., 1025; 16 Cyc., 1241-1243.

On the question of the court's charge on the burden of proof: Scott v. State, 46 Texas Crim. Rep., 85; Bagley v. State, 53 Texas Crim. Rep., 324, 103 S. W. Rep., 874.

Upon court's action in refusing testimony that State's witness could not have seen the shooting from the place where she said she did: Richards v. State, 53 Texas Crim. Rep., 400, 110 S. W. Rep., 432; Lockhart v. State, 53 Texas Crim. Rep., 589, 111 S. W. Rep., 1025, and cases supra.

On the question of adequate cause arising from insult to female relative: Kannmacher v. State, 51 Texas Crim. Rep., 118, 101 S. W. Rep., 238; Redman v. State, 52 Texas Crim. Rep., 591, 108 S. W. Rep., 365; Gillespie v. State, 53 Texas Crim. Rep., 167, 109 S. W. Rep., 158, and cases cited supra.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was indicted by the grand jury of

McLennan County, charged with murder. The court submitted the case, charging only on murder in the second degree, and manslaughter, and self-defense. The jury found appellant guilty of murder in the second degree, and assessed his punishment at ten years confinement in the State penitentiary.

1. In his first bill of exceptions, appellant complains of the following proceedings, alleging that "the State placed upon the stand a colored woman by the name of Ann Brandon, who testified for the State, among other things, that she saw the shooting in which the deceased was killed, and that she was standing behind a little mesquite bush near the Robinsonville road, and that she saw the deceased, Will Lee, go up the Robinsonville road in front of the defendant's house. And that Will Lee walked up to the front gate and said, 'Hello. What is the matter?' And when he said this, he stamped somewhat, and the first thing she heard after the stamping was the report of the gun and Will Lee said, 'O, Lord.' And Will Lee was standing in the public road when the gun was fired, and when the gun fired, she came out from behind the mesquite bush and left there. And thereupon, on cross-examination of this witness, the defendant asked her the question: 'If it were not a fact that on the next Sunday after this shooting occurred, she had a conversation with Mr. Fin Daugherty; and if she did not tell Mr. Daugherty on that Sunday, at her house, that when the shooting occurred, she was standing down by a tree immediately behind the deceased's house, two or three hundred feet from the Robinsonville road, pointing out the tree. And if she did not tell the said Daugherty that she didn't see or hear anything that occurred at the time the shooting occurred and could not see it?' And the said witness, in answer to said question, stated that she had no such conversation with Mr. Daugherty on the Sunday following the shooting; and that she did not point out to Mr. Daugherty the place where she was standing. And after the State had concluded its direct testimony in this case, the defendant placed Mr. Fin Daugherty upon the stand and he stated that on the Sunday after the shooting he was at the place where the shooting occurred and he had a conversation with this woman, Ann Brandon, and that she pointed out to this witness, a tree immediately behind the residence of the deceased. And stated to this witness that she was standing there under this tree when the shooting occurred, and that she did not and could not see or hear anything that happened out in the Robinsonville road in front of defendant's house at the time that Lee was shot. That this tree that she pointed out to him is 250 or 260 feet from the Robinsonville road, and from the place where the defendant and the deceased were when the shooting occurred.

"And that thereupon while the said Fin Daugherty was on the witness stand as a witness, the defendant proposed to prove by him the following facts, which if permitted to do so, the said witness, Fin Daugherty, would have testified, to wit: That he was familiar with

Vol. LXIII Crim.—34.

the ground where this shooting occurred and that a person standing at the tree at the back of Lee's house, where the State witness, Ann Brandon, told him she was standing when the shooting occurred, could not see a man standing in the road in front of defendant's house."

It will be seen that the appellant was permitted to contradict the witness upon every question propounded to her. She denied pointing to a certain tree and saying she was standing at it; the witness, Daugherty, says she did point out this tree. It appears as an undisputed fact in the record, that a person standing at this tree, could not see the place of the difficulty, the witness Ann Brandon stating herself in her testimony: "I don't suppose any person on earth could stand down there by that tree and see anything that was occurring in front of defendant's house." This bill presents no error, especially so when we take into consideration the qualification of the court in approving it.

2. In his second bill, the appellant complains that he was not permitted to prove by the witness, W. R. Thomas, that a little girl had shown him a knife and told him she had picked it up under the bridge where appellant says deceased was standing when he shot him. The testimony of Mr. Thomas shows that this conversation took place a month after the killing; that he did not see the girl get the knife from under the bridge, but that the little girl went into the house and brought a knife with her when she came back. He did not know where she got the knife. The statement of the little girl to Mr. Thomas, a month after the killing, was properly excluded. The little girl was permitted to testify, but her testimony could not be "bolstered" when there was no effort made to impeach her, by contradictory statements, reputation for truth and veracity, or otherwise.

3. The only other bill of exceptions in the record complains of the following proceedings: "Be it remembered that upon the trial of the above styled and numbered cause, the defendant requested the court, among other things, to give to the jury, as a part of the law of this case, special charge No. 4, which is as follows: 'I charge you, at the request of the defendant, as follows: If you find from the evidence in this case that on the night of the homicide, and before the killing, the wife of the defendant informed him that the deceased, William Lee, had had carnal knowledge of her person, and that the defendant, at the first meeting of the deceased, shot and killed the deceased, and at the time he shot him, the defendant was not justified in so doing, on the ground of self-defense or the protection of his home from an unlawful or forcible intrusion, you will not find the defendant guilty of murder, but if so, he would only be guilty of manslaughter. And in this connection, you are charged that it makes no difference whether the information received was true or false, if the defendant believed it to be true and acted upon such belief at the time.' And the court, after examining said charge as requested, refused to give said charge in the form in which it was written, but amended and added thereto the following language:

OLDHAM v. THE STATE. 531.

" 'And that such information, whether it was true or not, produced in the mind of the defendant such a degree of anger, rage or resentment as is sufficient to render the mind of the defendant incapable of cool reflection,' to which addition and qualification and amendment to said charge the defendant excepts, for the reason that said amendment required the jury to find as a fact whether or not, under the circumstances stated, adequate cause existed, and as to whether or not the mind of the defendant was incapable of cool reflection under said facts, when in truth and in fact, the information received, if the facts so received by the defendant from his wife, is made by our statute ipso facto adequate cause to arouse a degree of passion in any man of ordinary temper sufficient to dethrone his reason and render him incapable of cool reflection, and whatever may have been his condition of mind as a matter of fact, the information so received and acted upon by him, if the killing occurred upon the first meeting thereafter, would reduce the killing to the grade of manslaughter."

In considering this bill, we must also consider the evidence in the case. The appellant took the stand as a witness in his own behalf and testified on direct examination: "My name is Albert Oldham. I am charged with killing William Lee. I do not know exactly the date when it happened. I do not know exactly which month it was in, to tell the truth. At the time before the killing occurred, William Lee's wife was sick, and he got my wife to wait on his wife, and his wife was up on the streets again and able to work, and he promised to pay my wife for her trouble in waiting on his wife, but she worked there for him for three weeks, and he did not pay her anything for the time that she was down there in his service, and I had to cook my meals every morning, and go out two miles backward and forward to my work, and then cook at night, too. It was pretty hard on me, and I wanted my wife to come home and do my cooking for me, and she did not want to come. She did not want to leave down there, waiting on her daughter to come up and wait on me. I told her I thought she had stayed long enough, that Lee could get some one to assist him and pay them, so that she could cook for me; that if I did not get to my lot in time to do the feeding the old gentleman would get mad with me, and talk rash to me, and I wanted her to cook for me, so that I could get there in the proper time to keep him from being mad in the morning and at night, when I left, and that is why I insisted on her coming home. She came home, and I asked what was the reason she did not want to stay. She said William wanted her to stay down there and wait on Rosa. I asked her why she didn't get her sister to wait on her, and she said that sister would wait on her, but William did not want sister to wait on her because he did not think she knew what to do. I told her he would have to get some one because I did not marry her to wait on Mr. Lee, but I married her to wait on me, and if she was not going to be any service to me I would have to get somebody else. She said she did not want anybody else in the house,

and that she was the boss of it. I thought it was proper to ask her, was she going to stay at home or not. She said that she did not want to stay, that Lee insisted on her staying there to wait on him and his wife. I told her I could not afford to do anything like that.

I did not think Lee treated me right and wanted to go down there; I was going down there to see him about it. She told me not to go, and I said, 'I have got a right to go down there, if you want me to be dutiful to you as a husband and treat you right, and ask him.' She said, 'You have not got any business down there.' I said, 'I am going down there and ask him, because in the morning I have got to go back to my work and I won't have time.' She said, 'Don't you go down there at all.' I said, 'Well, I am going down there to see him.'

"I got up then and started to go down there, and she jumped up then and grabbed me and said, 'I am boss of this place. You ain't going nowhere.' I says, 'Yes, I is.' She said, No, you ain't going.' She said, 'You go down there and you and Mr. Lee will have some trouble.' I said, 'I have got a right to go and ask why he didn't treat me right. You don't want to treat me right. I don't think it is right for you to stay away from me three weeks, if you care anything for your husband, and wait on somebody else. That ain't right, and me working as hard as I work.' She said, 'You have not got any business down there meddling.' I said, 'I don't want to be meddling, but I have a right to go down there and ask him.' I said, 'Has he paid you anything?' She said, 'No.' I said, 'Did he pay you anything for the rent of your house? He has had it for four months.' She said, 'No.' And I said, 'Still you want me to take care of you and to be dutiful to you and do all the work.' She says, 'No, she didn't think that was right.' I said, 'Ain't it right for me to go down there and ask him?' She said, 'No, it was not right for me to go down there and ask.' I said, 'Well, I won't have time in the morning, and I am going now,' and I just started right out the door, and she grabbed me and tried to hold me. I tried to get her to turn me loose, and she said, 'No.' She said I should not go down there on her premises and interfere.

"Well, I got out there near the gate, and she just jerked loose from me and climbed over the gate, and commenced holloaing. When she commenced holloaing to turn her loose, I got afraid that may be the people would think I was trying to hurt her, something like that, and I turned her loose. She got in the road and followed the surrey up the road, and when I seen her going up there with the white people I thought I would come out there and try to get her to come back in the yard. I opened the little gate and passed out behind the surrey, and tried to catch her, going up the road towards Robinsonville, and she turned off and went across the mesquites, and I turned around and came back. I thought the white man said, 'You niggers all get back in the yard and hush that fuss.' So I turned around and came back in the yard, and just before I got back to the gate, why, William

Lee was coming up the fence from down on the madam's place up to mine, coming right up the fence, alongside the fence. I outran him and got to the gate, right inside the gate, and when he got to the gate he stopped and said, 'What is the matter? What are you doing, keeping this noise up here?' I said, 'Oh, it is just I and the madam, a little rucus. You have not got anything to do with it, Mr. Lee, at all.' I says, 'Otherwise, I don't think you have treated me right, as a gentleman, as kind as I have been to you, hauled wood and everything.' I said, 'My wife has been waiting on you for about three weeks, and you have not paid her anything, and she won't come back home. She just stays down there continuously.' I says, 'I don't think you have treated me right.' He says, 'What do you have to do with it?' I says, 'I have got a heap to do with it, because it is my wife, like any man would have who cares for his wife.' He says, 'You have not got a thing to do with it.' You can come around to the big gate and come in with the buggy or wagon, or come into the little gate. I saw him come in the little gate with the knife in his hand, and I broke and ran from him, and ran on the porch and stopped, and when I got on the porch, he was on the inside of the gate. I said, 'Mr. Lee, don't you come in my house with that knife. If you do, I will hurt you.' He said, 'Don't talk so much. You are not my boss.' I said, 'You are not the boss of my wife. I am the boss of my wife.' He said, 'Don't you like what I did?' I said, 'No, I don't like it. You have got no right to treat me that way, Mr. Lee.' He said, 'If you don't like it, we will settle it,' and he just came right on to me. Like any other person, when he came on to me with his knife in his hand, I ran until I got to the porch and stopped, and when I stopped, I told him I would hurt him if he did not go back. He just still continued to come on, and I ran in the house and picked up the gun, and went back to the door with the shotgun in my hand, and I said, 'Mr. Lee, if you don't go back with your knife I will hurt you.' He said, 'You have just got it to do.' I said, 'I will sure do it if you come in my house.'

"That is how came me to shoot William Lee. He would not stop, and he had his pocket-knife in his hand, and I shot him, but when I shot I did not know whether I hit him or not. He broke and ran, turned and ran right against the post that holds each gate together, and he stumbled and fell there, and ran on his hands, all fours, across the bridge, and then he got up straight, and then he ran down the public road towards Waco, and turned and went down the fence. That is exactly how it was, gentlemen.

"The bridge is a little culvert right at the road, where the water runs down on the side of the road. That bridge is not over four feet from my gate. That Robinsonville road is a graded road, gravelled, and that culvert I speak of is right over the drain right in front of my gate.

"I told Lee four or five times before I shot not to come into my

house with that. knife.  He said that if I did not like it we would
settle it right then and there; that is all he said.  When I shot him
he was still walking towards me with this knife in his hand.

"I was not doing anything to my wife.  The reason my wife holloaed
was because she could not make me say I would not go down there and
see William Lee.  When I started down there she commenced holloa-
ing for the white folks.  That scared me and I turned her loose and
I did not go down there; then I turned around and came back in my
own house.  She turned at the road and ran back down towards Mrs.
Benham's and Mr. Shephard's place.

"I have seen the knife that this little girl, Willie, found at the
bridge.  Mr. Thomas brought it up there while I was in prison and
showed it to me.  That was William Lee's knife.  I knew his knife.
The knife had a bone handle on it.

"There were some white gentlemen passed the road that night going
towards Robinsonville in a surrey when my wife got over the fence.
When she got over the fence I turned loose and went and got over the
gate into the road.

"William Lee was coming towards me when I shot the first shot.
It is between seven and eight steps from my gate to my front door.  He
was inside of the yard and was coming towards me, with this knife
in his hand, when I shot.  He said if I didn't like what he had done,
we would settle it right now.  I did not have anything and I ran in
the house.  My gun was setting right up at the head of the bed, in
the corner.  I had to cross the house to pick the gun up.  I had a
pistol there.  I fired six shots.  The pistol was lying on the bureau
right at the door.  I did not know whether I hit Lee or not when I
shot the shotgun, and it would not shoot but once, and I set it down
and got the pistol and commenced shooting, but I did not know
whether I hit him at all or not until afterwards.

"It was dark out there.  You could not see any farther than from
here to the door, anyhow.  It was dark when I got to town to the city
hall.  I owned the house I was living in at that time.  My wife owned
the house that Lee was living in.  Besides the house, I owned at that
time, two acres and a half below Robinsonville there."

This is all the testimony on direct examination, and no mention is
made that he was angry because it had been reported to him that
deceased had had improper relations with his wife, or that deceased
had had improper relations with his wife.  On cross-examination, the
State developed that at the examining trial, held some months before,
the appellant had said nothing about the deceased having a knife and
was making an assault on him with it, but at the examining trial, had
said the reason he shot him was that his wife had told him that night
deceased and her had had carnal intercourse.  The State introduced
the statement made at the examining trial in evidence, bringing this
question into the case, for the purpose of showing that his defense at
this trial was wholly different to the grounds alleged at the examining

trial. We do not think that, the record being in this condition, the court could charge the jury as a matter of law, that this reduced the offense to manslaughter. The statute, it is true, makes "adultery of the person killed, with the wife of the person guilty of the homicide, 'adequate cause,' provided the killing occur as soon as the fact of an illicit connection is discovered," but it is not every case of adultery that will reduce the offense to manslaughter. This "adequate cause" must produce passion, and generally it does do so, but every case must stand or fall on the facts in that case. In the case of Massie v. State, 30 Texas Crim. App., 69, in discussing a case of this character, this court held: "There must not only exist the adequate cause coupled with the defendant's knowledge of its existence, but the disturbed condition of the mind and the necessary 'passion' must also exist in order to reduce the killing from murder to manslaughter. . . . In the absence of the 'passion' that reduces a homicide to manslaughter, the unattended 'adequate cause' may become evidence of the most cogent force showing the antecedent malice on the part of the slayer. In such case the 'adequate cause,' unattended by the necessary 'passion' rendering the mind incapable of cool reflection, instead of constituting an extenuation of the crime, may and would become an aggravating circumstance attending the commission of the offense."

So, in this case, we think, in view of the fact that the appellant, in his testimony on direct examination, said nothing about this matter, but it had to be drawn out of him on cross-examination for the purpose of breaking down the defense he was making, the court very properly submitted to the jury the issue whether or not this "adequate cause" really produced passion or anger.

4. These are all the bills of exception in the record, and we can not consider the grounds in the motion relating to admissibility of testimony, to which no bills of exception were reserved.

5. The appellant complains that the court, in his main charge, instructed the jury: "If you believe from the evidence, beyond a reasonable doubt, that the defendant, with a deadly weapon and that the same was a gun, in a sudden transport of passion, aroused by adequate cause as the same is herein explained, and not in defense of himself against an unlawful attack, reasonably producing a rational fear or expectation of death or serious bodily injury, did unlawfully shoot and thereby kill Will Lee, the deceased, as charged in the indictment, you will find the defendant guilty of manslaughter," assigning as the ground of his objection, that said portion of the charge shifts the burden of proof. We do not think there is anything in this contention, but that this paragraph, in connection with the remaining portion of the charge, was a proper application of the law to this case.

6. There is some complaint of the charge of the court in applying the law of self-defense, but when we take into consideration that the court gave the three special instructions requested by appellant, no error appears. The instructions given at request of appellant are as

follows: "You are given the following charges at the request of the defendant: If you find from the evidence in this case that the defendant was justified in firing the first shot at the deceased, and that after said shot, he fired several others, you are charged that he would have the legal right to continue to shoot as long as he considered himself in danger, whether said danger was real or apparent.

"I give you the following charge at the request of the defendant, which you will accept as part of the law of this case. Any citizen of this State has a right to defend the possession of his home against any unlawful or violent intrusion by another without his consent, and his right to defend his home is governed by the same rule which governs a man's right to defend his person. Now, if you find from the evidence in this case, beyond a reasonable doubt, that the defendant, Albert Oldham, shot and thereby killed the deceased, William Lee, but that at the time of said shooting and killing, the said William Lee was attempting to, or the defendant had reasonable grounds to believe that the said William Lee was attempting to make an unlawful and forcible intrusion upon the home of said defendant, Albert Oldham, against the consent of said Albert Oldham, armed with a knife or any other kind of deadly weapon, and that the defendant believed at the time that it was necessary for the protection of his home or his person against an unlawful and violent intrusion upon the same by the deceased, Lee, and you further believe that said belief on the part of the defendant was reasonable, viewing the same from the standpoint of defendant at the time, then the defendant had a right under our law to protect his person or his home, even to the extent of taking the life of the deceased, Lee. And if you so find from the evidence in this case, you will find the defendant not guilty, or if, under all the testimony in this case, you have a reasonable doubt on this question, you will give the defendant the benefit of it, and render a verdict of not guilty.

"You are charged as part of the law of this case, at the request of the defendant, that if you find from the evidence in this case that the deceased, William Lee, at the time he was shot, if you find that he was shot, was undertaking to make an entrance by force, and against the consent of the defendant, upon the premises and yard of the defendant. And that the defendant ordered him not to do so, and by the words and acts of the deceased, he showed an intention so to do, against the will and consent of the defendant, and you find that the defendant failed to use all other means which a reasonable man ought to have used under like circumstances before shooting, but that on account of the acts and conduct of the said William Lee at the time, he so aroused the passion of the defendant, as to render his mind incapable of cool reflection, and that the defendant, under such circumstances, shot and killed the deceased unlawfully and not in his own self-defense or in the defense of his habitation as those terms will be defined in another

charge, you can not find the defendant guilty of murder, but the killing under such circumstances would be manslaughter only."

These charges, given at appellant's request, together with the court's charge on self-defense, presented every theory of appellant's defense, and he has had a fair and impartial trial. Every issue raised by the testimony introduced by appellant was affirmatively presented in the charge, and special charges given, and there being no error manifest in the record, the judgment is affirmed.

*Affirmed.*

[Rehearing denied January 10, 1912.—Reporter.]